IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

ALMA R. HALL, §
§
Plaintiff, §
§
v. § 2:10-CV-269
§
MICHAEL J. ASTRUE, §
Commissioner of Social Security, §
§
Defendant. §

## REPORT AND RECOMMENDATION
## TO AFFIRM THE DECISION OF THE COMMISSIONER

Plaintiff ALMA R. HALL, acting *pro se*, brings this cause of action pursuant to 42 U.S.C.

§ 405(g), seeking review of a final decision of defendant MICHAEL J. ASTRUE, Commissioner

of Social Security (Commissioner), denying plaintiff's application for disability insurance benefits

and supplemental security income benefits.  Both parties have filed briefs in this cause.  For the

reasons hereinafter expressed, the undersigned United States Magistrate Judge recommends the

Commissioner's decision finding plaintiff not disabled and not entitled to benefits be AFFIRMED.

I.
THE RECORD

In December 1984, plaintiff Alma Hall was at work attempting to climb out of a boxcar.

(Transcript [hereinafter "Tr."], pg. 249).  She slipped and started to fall off of the boxcar, but saved

herself from the fall by grasping the side of the boxcar.  (*Id.*). She was momentarily suspended from

the boxcar, hanging on only by her left arm.  (*Id.*).  Not long after the accident, plaintiff began

experiencing pain, numbness, and tingling in her left hand radiating into the forearm, elbow,

shoulder, and neck.  (*Id.*).  A CT scan of plaintiff's spine revealed disc narrowing between the C4-C5 and C5-C6 vertebrae, a narrowing of the neural foramen bilaterally at the level of C4-C5, C5-C6, and C6-C7, and osteophyte formation at the C5 and C6 levels.  (*Id.* at 263).  In short, among other ailments, Ms. Hall had a ruptured disc in her neck at the C5-C6 vertebrae.  (*Id.* at 237).  In December 1985, plaintiff underwent neck surgery to correct this problem.  (*Id.* at 265).  Specifically, Dr. Jeffery Cone, plaintiff's neurologist, performed an anterior cervical diskectomy and a fusion of the C5-C6 vertebrae.  (*Id.* at 262, 265).

Ms. Hall wore a neck brace, and was doing well, for six weeks after the surgery.  (*Id.* at 237, 246).  When she removed the brace, however, her pain came back.  (*Id.* at 246).  Plaintiff was referred to a physical therapist and an MRI was ordered.  (*Id.* at 244, 246).  The MRI of plaintiff's neck revealed a "bony defect at C5-C6 level apparently associated with previous surgery."  (*Id.* at 258).  The MRI of plaintiff's lumbar spine came back normal except for "a slight bulge of the anulus at L5-S1."  (*Id.* at 261).  It appears no medical action was taken at that point because no additional disc herniation was found.  (*Id.* at 237).  Dr. Cone did, however, refer plaintiff to a Dr. Ralph Citron for a physical impairment and disability rating.

In July 1986, Dr. Citron evaluated plaintiff.  (*Id.* at 237).  At that time, Ms. Hall reported pain in her right hand (which was consistent with her history of carpel tunnel syndrome and two surgeries to alleviate the syndrome).[1]  (*Id.* at 238).  Dr. Citron reported, "[t]he patient at this time is quite satisfied with her neck and left arm."  (*Id.*).  He additionally indicated, however, "[s]he did go to a chiropractor, which made the pain in her neck considerably worse."  (*Id.*).  Dr. Citron concluded the

---

[1]  The only ailment used as a basis for disability was plaintiff's neck and back problems.  Any medical condition apart from the neck and back problems is therefore mentioned only to provide a more complete background.

neck surgery was successful and "the patient is now doing very well" and did not require any additional treatment at that time. (*Id.*). The doctor indicated plaintiff could return to work, reporting "[t]he patient is able to do any . . . type of work, provided she does not lift more than forty pounds. It is my opinion that [Ms. Hall] has a 10% loss of earning capacity as a result of the injury to her neck." (*Id.* at 239). Approximately one week after Dr. Citron's report, Dr. Cone also indicated Ms. Hall was able to return to work. (*Id.* at 242).

The record does not indicate plaintiff returned to work at that point (in July 1986). Rather, the record before the Court indicates plaintiff's work history following the surgery did not start until 1991. (*Id.* at 144). From 1991 until 1995, plaintiff worked in various positions in customer service, cashier, and telemarketing jobs. (*Id.* at 144).

In August 1995, plaintiff was in a car accident. (*Id.* at 283). Plaintiff was taken to the hospital but released soon thereafter. (*Id.*). Based upon her complaints of neck pain following the accident, plaintiff's attorney (for the personal injury case following the car accident) sent her back to Dr. Cone for evaluation. (*Id.*). Dr. Cone evaluated plaintiff in December 1995. At that time, plaintiff indicated she had not developed any new health problems following the 1985 surgery, and the doctor noted plaintiff had done well post-surgery. (*Id.*). Dr. Cone additionally noted plaintiff walked using a cane, although he was unsure of the reason for her doing so, as her gait and posture were excellent. (*Id.*).

The day following her appointment with Dr. Cone, an MRI of plaintiff's cervical spine was taken. (*Id.* at 255). The MRI report indicated plaintiff was complaining of pain in her neck, left shoulder, and left upper extremity. (*Id.*). The MRI itself showed,

> There are findings consistent with a small left paramedian disc herniation at th C3-C4 level. There is a large central disc herniation at the C4-C5 level. There is a

diffuse bulging anulus at the C6-C7 level without definite disc herniation.   The central disc herniation at the C4-C5 level does result in cord compression.

(*Id.*).

At that point, plaintiff began going to Dr. Robert Paige, a pain management specialist.   (*Id.* at 282).   Dr. Paige started a regime of cervical epidurals.   (*Id.*).   After the first epidural, plaintiff reported she "is doing a lot better and she is able to work full-time and in fact has relief of pain in her arms and shoulder blades.   She still has some pain in her leg and her C-spine.   Overall she is much better though."   (*Id.*).   At that visit, which was on January 23, 1996, plaintiff received another epidural, but declined any prescription pain reliever, as "she works and is getting by with over-the-counters."   (*Id.*).

On February 13, 1996, Dr. Paige gave plaintiff another epidural.   (*Id.* at 279).   At that time, plaintiff reported she was still working full time.   (*Id.*).   The doctor noted, however, "she has some headache, [sic] so I am going to have her start on some Esgic Plus."   (*Id.* at 280).   Later in February 1996, Dr. Cone wrote plaintiff a note excusing her from work until March 18, 1996.   (*Id.* at 278).   Plaintiff again returned to Dr. Paige on March 15, 1996, at which time the doctor wrote,

> This patient states that she is not doing well, continuing to have pain in her shoulders, her head, her neck, her intrascapular muscle . . . I am not going to repeat injection because I do not think with the three previous injections not helping her in the long term, although each one, she stated made her better.   I would not repeat another one at this point.

(*Id*. at 276).   Dr. Paige referred plaintiff back to Dr. Cone.   On March 26, 1996, Dr. Cone again saw plaintiff.   (*Id*. at 240).   Dr. Cone noted plaintiff was still having problems, and that plaintiff in fact felt the injections had made everything worse.   (*Id.*).   The doctor referenced the results of the MRI showing disc bulges at the C3-C4 and C6-C7 levels, and indicated "will schedule surgery when OK'd w/Ins. Co., per attn Ed Walters" (Ed Walters was the attorney plaintiff had retained to litigate

the car accident case). (*Id.* at 240, 241). On that day, Dr. Cone wrote plaintiff a work note stating plaintiff could return to work, but only at thirty hours a week and with no lifting over thirty pounds. (*Id.* at 277). According to the medical records before the Court, the last time plaintiff ever consulted a doctor seeking relief for her neck and back pain was this 1996 visit with Dr. Cone.

At this point the medical records are again silent for approximately another ten years. There is no indication that plaintiff received the surgery recommended by Dr. Cone or, for that matter, as indicated above, ever sought treatment from him or any other doctor after March 1996. Plaintiff would later indicate that during this period of time, specifically on July 20, 2002, her disability began. Despite her disability, plaintiff worked from August 2002 to October 2002 as a teacher's aide. (*Id.* at 214). She was laid off due to budget cuts. (*Id.*). Also, from 2002 to 2006, plaintiff maintained her own business as an independent beauty consultant. (*Id.* at 217).

In July 2005, plaintiff underwent a physical examination for the purpose of obtaining a job as a school bus monitor. (*Id.* at 330). At that time, plaintiff indicated she had decreased function in her neck due to the replaced disc, along with decreased function in her hand(s) and hip (because, she indicated, a portion of her hip bone had been used in the disc replacement surgery). (*Id.* at 332). The doctor who evaluated her cleared Ms. Hall for work, saying "[n]o medical restrictions are indicated," and made the special notation "carries a cane but does not require it." (*Id.* at 333). Plaintiff went on to work, part-time, in the bus monitor position. (*Id.* at 160). According to plaintiff, she worked in that position for less than one month before she was put on leave and eventually fired. (*Id.* at 159). Ms. Hall says the bus company let her go so as to give the job to someone who could work without a cane. (*Id.* at 34).

After her employment with the bus company in July 2005, the records indicate the only job plaintiff maintained was as a self-employed independent beauty consultant. (*Id.* at 158). In June 2007, plaintiff sought employment with the City of Amarillo. (*Id.* at 361). Plaintiff again underwent a physical evaluation for the purposes of obtaining employment. (*Id.*). On June 1, 2007, a Dr. James Lucas, working for Concentra Health Services, evaluated Ms. Hall. (*Id.*). At that time, he indicated,

> She complains of chronic neck and upper back pain. She complains of pain in the arms when used a great deal and complains of pain in the right ankle with prolonged standing and walking and also some pain in the right hip area with prolonged standing and walking. Other than the musculoskeletal system, her review of symptoms is negative.

(*Id.*). Apart from her complaints of pain, all of the tests Dr. Lucas performed on plaintiff indicated she was well. Among other indicators of general overall health, Dr. Lucas wrote plaintiff was "[w]ell-developed," "well-nourished," and "in no acute distress." (*Id.*). "She is able to move her neck in all planes with no limitation." (*Id.*). Regarding her back, the doctor reported "[l]ateral bending to 40 degrees bilaterally without difficulty. She can forward flex her back to 80 degrees without pain." (*Id.* at 362). Despite these results, however, Dr. Lucas declined to clear plaintiff for work. He stated:

> Impression is reserved at this time because I will not sign her physical evaluation that she is able to perform her job duties because before this is done, she needs to have a human performance evaluation . . . Pending the outcome of this, we will determine whether she can perform the job requirements as outlined by the City of Amarillo.

(*Id.*). The record is unclear on exactly what constitutes a "human performance evaluation." A June 20, 2007 letter from the Human Resources Department of the City of Amarillo to Ms. Hall indicated, however,

> Based on the pre-placement evaluation by Concentra, they are not releasing you to work the part-time position in the Human Resources Department. Concentra is recommending further evaluation. We are requesting that you visit your current

> treating physician for his evaluation . . . Enclosed is a letter to Dr. Cone, a letter with
> a brief outline of the job duties and the Essential Job Functions Form.  Please take
> all documents to Dr. Cone for his evaluation.

(*Id.* at 229-31).  The record indicates plaintiff failed to comply with the City's request.  She apparently did not undergo evaluation by Dr. Cone or any other doctor.  Consequently, Dr. Lucas never gave a final opinion on plaintiff's ability to work for the city.

Plaintiff did, however, on July 2, 2007, less than two weeks after the letter from the City, apply for Social Security Disability Insurance Benefits and for Supplemental Security Income Benefits.  (*Id.* at 104-106, 07-109).  In both of those applications, plaintiff indicated she suffered from a disability that began on July 20, 2002 and continued to the date of the application, in July 2007.  (*Id.* at 104, 107).  At a face-to-face meeting with plaintiff, an interviewer with the Commissioner created a Disability Report, in which it was noted that plaintiff indicated she had difficulty sitting, standing, and walking.  (*Id.* at 134).

In the Function Report, completed by plaintiff on July 19, 2007, Ms. Hall indicated she suffered daily from pain on the right side of her body and that pain had "taken over [her] life."  (*Id.* at 136, 143).  Despite this, plaintiff reported she was able to prepare food or meals daily and perform all light-duty household chores.  (*Id.* at 138).  Plaintiff did, however, indicate that the amount of pain she was in impacted the length of time it took her to cook and clean and that if she did not feel well, she did not do any household chores.  (*Id.*).  Plaintiff indicated she enjoyed window shopping, talking on the phone, and visiting friends, although she only engaged in such activities when she was not in pain.  (*Id.* at 140).  She later indicated her social activities were non-existent because of the pain.  (*Id.* at 141).  Plaintiff indicated she could lift twenty pounds, but that it hurt to bend.  (*Id.*).  Regarding her cane, plaintiff stated she required a cane "because I am not firm in my body," and that

her doctor prescribed use of the cane after her December 1985 surgery.  (*Id.* at 142).  On the whole, plaintiff said her problem with her neck and back impacted her lifting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and task completion abilities.  (*Id.* at 141).  Plaintiff indicated that, because of Dr. Lucas's failure to certify she was able to work, no one would hire her. (*Id.* at 143).

Plaintiff's initial applications for benefits were denied, and plaintiff appealed.  (*Id.* at 47). Upon the reconsideration of the denial of benefits, a Dr. James Wright, a state agency doctor, competed a Residual Functional Capacity Assessment (RFC).  In the RFC, Dr. Wright concluded plaintiff was able to occasionally lift twenty pounds, frequently lift ten pounds, and stand and/or sit for six hours in an eight-hour workday. (*Id.* at 374).  He indicated plaintiff would require occasional postural limitations.  (*Id.* at 375).  Dr. Wright concluded plaintiff's allegations could be attributed to a medically diagnosed impairment but that plaintiff's allegations of limited function were only partially supported by the medical evidence of record.  (*Id.* at 376).  The denial of benefits upon reconsideration was based on Dr. Wright's conclusions.  (*Id.* at 49).  The explanation of determination also stated:

> The evidence we now have does not show that your condition is disabling.  We based our determination on this evidence because you did not take the medical examination we asked you to have at our expense.  The examination was needed to fully evaluate your condition.  You said you were disabled because of spondylosis post back surgery, leg pain and numbness.  You were requested to have a special examination paid for by the government.  Although we made arrangements for the examination, you did not keep the appointment.  If you decide you will attend the special medical examination (at our expense), write, call, or visit any Social Security office.

(*Id.* at 57; *see id.* at 188, 372).

After the denial upon appeal, plaintiff requested a hearing by an Administrative Law Judge (ALJ) on her claims.  (*Id.* at 70).  At the September 2009 ALJ hearing, plaintiff testified regarding

her daily activities, saying she spent the day "[i]n the house, in the bed, other than using the bathroom and cleaning myself up." (*Id.* at 38). She indicated over-the-counter pain relievers helped alleviate the pain as long as she stayed still in bed. (*Id.* at 36). Regarding her understanding of Dr. Lucas's refusal to approve her for work, plaintiff stated, "the reason why Dr. Lucas placed me on medical hold is because the disc themself had wore out, and everything, including my heart, have got to strengthen because the steroid itself was the medicine." (*Id.* at 39). Plaintiff said,

> [Dr. Lucas] found me, he told me when I want you released, I will release you. If you want to live, stay off of your body. Your nerve, your disc, the disc -- after the steroids had to be killed because of the -- I'm saying it like he told me -- after he had to kill the steroids, and give me more blood, my body have got to strengthen.

(*Id.* at 40). Plaintiff additionally indicated she was "supposed to keep the cane . . to keep [body weight] off of my motor nerve." (*Id.* at 40-41).

At the hearing, a vocational expert also testified. He stated that, based upon the above-discussed RFC, which set forth a capacity for light work, reduced by the requirement that postural activity and overhead reaching be on an occasional basis only, a hypothetical person with plaintiff's same characteristics and background would be able to work in plaintiff's past jobs as a cashier and telemarketer. (*Id.* at 34-35).

Toward the end of the hearing, the ALJ explained to plaintiff, "unless there is medical support for what you are telling me, then I'm not going to be able to help you." (*Id.* at 42-43). The ALJ indicated that, in order to obtain the medical evidence necessary to support plaintiff's claims, she had to go to a doctor. (*Id.* at 43). The ALJ asked plaintiff to agree to seeing a doctor for evaluation. (*Id.*). Plaintiff declined, saying she would not see any doctor unless he or she was a specialist because non-specialists would "put lots of weight on my back, body, and end up having me fall out, and say she's dead, you can pay a specialist." (*Id.* at 44).

SS\R&R\Hall-269.affirm.step 4: 3

The ALJ determined plaintiff was capable to performing past relevant work as a cashier and telemarketer, and he consequently denied plaintiff benefits at step four of the Commissioner's five-step sequential analysis. (*Id.* at 14-22). The ALJ based his determinations upon the RFC completed by Dr. Wright and the testimony of the vocational expert. (*Id.* 20, 22). The Appeals Council denied plaintiff's request for reversal of the ALJ's determination. (*Id.* at 1). This federal suit followed.

## II.
## ISSUES

Plaintiff raises three grounds of error:

1.    Substantial evidence did not support the ALJ's determination.

2.    The ALJ's denial of interim benefits resulted in a violation of plaintiff's rights under the Equal Protection Clause.

3.    The hearing by the ALJ was not conducted in a reasonable amount of time subsequent to plaintiff's request for the hearing.

## III.
## MERITS

A disabled worker is entitled to monthly social security benefits if certain conditions are met. 42 U.S.C. § 423(a). A worker is disabled if he or she cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or last for a continued period of twelve months. *Id.* § 423(d)(1)(A). The Commissioner has promulgated a five-step sequential evaluation process the ALJ must follow in making a disability determination. *See* 20 C.F.R. § 404.1520(b)-(f). The claimant has the initial burden of establishing a disability in the first four steps of the analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.704 (2012) ("When evidence is needed to prove your eligibility [for disability benefits] . . . you will be responsible for

obtaining and giving the evidence to U.S.").   At the fifth step, the burden then shifts to the Commissioner to show the claimant is capable of performing work in the national economy. *Yuckert*, 482 U.S. at 146 n.5, 10 S.Ct. at 2294.

In reviewing the propriety of an ALJ's decision that a claimant is not disabled, the reviewing federal court's function is to ascertain whether the record as a whole contains substantial evidence to support the Commissioner's factual findings and whether any errors of law were made. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).   Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).   It is more than a scintilla but less than a preponderance. *Id.*, 91 S.Ct. at 1427.   To determine whether substantial evidence of disability exists, four elements of proof must be weighed: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).   While procedural perfection is not required, the ALJ does have a duty to fully and fairly develop the facts relating to a claim for disability benefits. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).

If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980).   Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding

of no substantial evidence. *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). The level of review is not *de novo*. Even if the ALJ *could* have found plaintiff to be disabled, the only issue a reviewing federal court may rule on is whether there was substantial evidence to support the ALJ's decision.

### A. Substantial Evidence

In her first ground of error, plaintiff avers substantial evidence did not support the ALJ's determination but rather supported her contention that the pain she experiences from her neck/back problems is disabling. The ALJ found plaintiff suffered from spinal impairment and remote history of spinal surgery. (*Id.* at 19). He concluded, however, plaintiff's pain was not disabling and that plaintiff "ha[d] the residual functional capacity to perform a limited range of light work." (*Id.* at 20). Plaintiff's past relevant work as cashier and telemarketer both fell within the residual functional capacity determined by the ALJ. (*Id.* at 22).

### 1. Objective Medical Facts

As recited in section II, above, the objective medical facts in this case indicate plaintiff had neck surgery in 1985. She did not go back to the doctor for any subsequent neck pain for a decade. After experiencing a car wreck in 1995, plaintiff returned to her neurosurgeon again complaining of pain in her neck. MRI's taken at that time indicated plaintiff had a "small left paramedian disc herniation at the C3-C4 level" and a "large central disc herniation at the C4-C5 level." (*Id.* at 255). After epidural injections were unsuccessful in alleviating her pain, plaintiff's doctor determined she required additional neck surgery, which plaintiff never had.

The Social Security Administration has set forth a series of regulations to which the Commissioner, and those acting on his behalf, are bound. Those regulations establish, "[d]iagnosis

and evaluation of musculoskeletal impairments should be supported, as applicable, by detailed descriptions of the joints . . . condition of the musculature (e.g., weakness, atrophy), sensory or reflex changes, circulatory deficits, and laboratory findings, including findings on x-ray or other appropriate medically acceptable imaging."  20 C.F.R. Pt. 404, Subpt. P., App. § 1(C)(1) (2012). Because musculoskeletal impairments (such as problems with the spine) "frequently improve with time or respond to treatment," the regulations emphasize the importance of a longitudinal clinical record.  *Id.* (H)(3).  If there is not a lengthy medical record detailing the progress of an impairment, "evaluation will be made on the basis of the current objective medical evidence and other available evidence, taking into consideration the individual's medical history, symptoms, and medical source opinions."  *Id.*

Unfortunately for plaintiff, the ALJ correctly observed the objective medical facts are limited in this case.  The record indicates plaintiff has not been to see a doctor for treatment since 1996.  She consulted with doctors for job placement purposes in 2005 and 2007, but those doctors did not perform any tests on plaintiff that would lead to objective medical evidence.  Importantly, there is no objective medical evidence regarding the condition of plaintiff's spine after the alleged disability onset date of July 20, 2002.  Consequently, at the time the ALJ reviewed plaintiff's claims in 2009 the "most recent" objective medical facts the ALJ had to review were twelve years old.  Plaintiff's lack of a longitudinal clinical record of her impairment, which is strongly recommended by the regulations, was exacerbated by the additional lack of "current medical evidence," which the regulations require when there is no longitudinal record.  *See id.* §1(H)(3).  Thus, the ALJ did not have the "detailed description" of the impairment required by the regulations upon which to base a favorable determination.  *See id.*

The Social Security Administration attempted to compile the necessary medical evidence regarding petitioner's alleged disability, at no expense to plaintiff.  The Administration scheduled an appointment for Ms. Hall with a Dr. Neil Veggeberg of the High Plains Rehab Association.  (Tr. at 188).  Plaintiff did not object to the consultative examination.  *See* 20 C.F.R. § 1519j.  In fact, Ms. Hall wrote Dr. Veggeberg a letter before the date of the appointment explaining her medical history and condition.  (*Id.*).  Plaintiff failed, however, to go to the appointment.[2]  (*Id.* at 57, 372).  At the hearing, the ALJ again offered to send plaintiff to a doctor, at no cost to plaintiff, so he could obtain objective medical evidence regarding plaintiff's claims.  (*Id.* at 44).  Plaintiff, citing her belief that a non-specialist's examination would hurt and possibly even kill her, refused.  (*Id.* at 44).

It was plaintiff's burden to present evidence in support of her claim that she was disabled as of July 20, 2002.  *See Yuckert*, 482 U.S. at 146 n.5, 107 S.Ct. at 2294.  She failed to meet that burden by failing to present any objective medical facts in support of her allegation of disability.  Moreover, according to the rules promulgated by the Social Security Administration, "If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability . . . we may find that you are not disabled."  20 C.F.R. § 404.1518(a).  It may have been that the Commissioner would have paid Dr. Cone, plaintiff's treating specialist, to perform the required examination.  *See id.* § 404.1519h.  Plaintiff did not request such action, however.[3]

---

[2]  At the hearing, Ms. Hall stated, "Social Security have it [sic] going in a way that, you know, that we were able to dismiss you because you wouldn't use our doctor.  I already had a doctor."  (Tr. 27).  The record indicates, however, that Ms. Hall never went to her doctor (or any doctor) for treatment or for evaluation for social security disability determination purposes.

[3]  In a work history report, plaintiff indicated she believed that a doctor, presumably Dr. Cone, had "experiment[ed] on my body just to find out something for his further work."  (Tr. 165).  Plaintiff then stated, "[t]here will be no more operation on my body."  (*Id.*).

Plaintiff refused to be examined by a doctor of the agency's choosing, without giving what the Administrator considers a good reason for doing so, and likewise failed to have her own doctor examine her. *Id.* § 404.1518(b).

It is possible that all of plaintiff's complaints and representations could have been supported by objective medical evidence. It is also possible they would not have been so supported. Because of plaintiff's unwillingness to cooperate with the Social Security Administration's requests to submit to a medical evaluation, and because of her own failure to independently seek out treatment and/or evaluation post-July 2002 by a doctor of her own choosing, the ALJ had no objective medical evidence regarding plaintiff's condition from the alleged onset date of July 20, 2002 forward. The Court has reviewed the issue of plaintiff Hall's self-representation, and notes that plaintiff was represented by counsel up to the ALJ hearing and then discharged her lawyer before the ALJ hearing began. Further, when presented with the option of being given additional time to contact Legal Aid or find another lawyer, plaintiff declined and asked for the hearing to be held. The undersigned, of course, cannot determine from a cold record whether plaintiff suffers from any mental impairments, but whether she does or not, the defendant Social Security Administration appears to have done all it could to allow plaintiff to have a meaningful hearing and to provide the necessary documentation of disability.

2. Diagnosis and Opinions of Treating and Examining Physicians

The medical record before the Court indicates Dr. Cone was the doctor with whom plaintiff had the most interaction. He not only was the doctor who performed the successful surgery on plaintiff's neck in 1985, but he was also the doctor to whom she returned ten years later when she re-injured her neck. In 2007, plaintiff indicated Dr. Cone was her current treating physician. (*Id.*

at 229).  In the last interaction between Dr. Cone and plaintiff, which occurred in 1996, Dr. Cone

recommended plaintiff undergo back surgery again.  (*Id.* at 240).  Clearly, Dr. Cone believed

plaintiff had problem(s) with her neck/back requiring surgical intervention.  Even then, however,

Dr. Cone indicated plaintiff was still able to work a thirty-hour work week with no lifting over thirty

pounds.  (*Id.* at 277).  The record indicates plaintiff did, in fact, return to full-time work after Dr.

Cone's 1996 medical restriction.  (*Id.* 158-64).  The record provides no diagnosis or opinion from

Dr. Cone after the alleged onset date of July 20, 2002 in support of plaintiff's claim of disability.

In 2005, approximately three years after plaintiff's onset date, plaintiff underwent a pre-

employment physical examination by a Dr. James Kelley.  (*Id.* at 5).  After his examination, Dr.

Kelley determined plaintiff was capable of working with "no medical restrictions."  (*Id.* at 333).

Thus, a doctor examining plaintiff after July 20, 2002 concluded plaintiff was able to work with no

restrictions.  This finding directly contradicts plaintiff's representation that she was disabled, and

not able to work, as of July 20, 2002.

In 2007, plaintiff again underwent a pre-employment physical examination, this time

performed by Dr. James Lucas.  Plaintiff makes a great deal out of what she refers to as the "medical

hold" placed on her by Dr. Lucas as a result of the examination.  Based on the cold record before

the Court, however, Dr. Lucas's note does not go as far as plaintiff contends.  First, Dr. Lucas was

not plaintiff's treating physician.  Rather, he was a doctor hired by a third party to determine

whether plaintiff was capable of performing the requirements of a job.  According to the record

before the Court, Dr. Lucas saw plaintiff one time for purposes of evaluation, not for purposes of

diagnosis or treatment.  Additionally, Dr. Lucas did not, as plaintiff represents, affirmatively

conclude plaintiff was unable to work.  Rather, he declined to certify plaintiff was capable of

working, choosing instead to ultimately have plaintiff return to Dr. Cone, plaintiff's actual treating physician. (*Id.* at 362). Dr. Lucas's "passing the buck" was not, as plaintiff contends, tantamount to a final determination of inability to work. Her representations before the ALJ that Dr. Lucas told her if she wanted to live, she had to stay off of her body and that her body needed to strengthen, (Tr. 40), has no support in the record before the Court.

In sum, no doctor ever placed any significant, long-term restrictions on plaintiff due to any neck or back problems. No doctor ever imposed restrictions indicating plaintiff was unable to work at the level the Commissioner defines as "light" due to an untreatable medically diagnosed impairment beginning in July 2002.[4] *See* 20 C.F.R. § 404.1567(b) (classifying light work as lifting no more than twenty pounds occassionally).

### 3.  Subjective Evidence of Pain and Disability

Plaintiff indicated, with record support, that she had a history of neck and back problems and had, in fact, underwent back surgery in 1985. A doctor opined in 1996 that plaintiff again required back surgery, which plaintiff never received. Plaintiff testified she was in constant pain from her neck/back impairments and was therefore disabled.

Pain can constitute a disabling impairment. *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). However, pain is disabling only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990). By itself, the fact that plaintiff may suffer some pain while working is not enough to support a finding of disability. *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983). Rather, "[p]laintiff must show that

---

[4] Plaintiff did attempt to subpoena both Dr. Cone and Dr. Lucas to the hearing before the ALJ. (Tr. 27). Neither doctor appeared at the hearing. The record casts doubt on how helpful their testimony would have been, however, as Dr. Cone had not evaluated plaintiff since 1996 and Dr. Lucas's 2007 examination was apparently only cursory. Plaintiff has not shown either doctors' testimony would have helped her.

[she] is so functionally impaired that [she] is precluded from engaging in substantial gainful activity." *Id.* (citations omitted). The decision of whether plaintiff's pain is disabling rests soundly within the discretion of the ALJ. *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988). The ALJ's determination is entitled to considerable deference. *See James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986).

In this case, the ALJ found plaintiff suffered from a spinal impairment and had a remote history of spinal surgery. (Tr. 19). He determined, however, "[Ms. Hall's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity." (Tr. 21). The ALJ further found Ms. Hall's complaints were not consistent with the record evidence. (*Id.*). This determination, which is well explained, finds support in the record. *See Falco*, 27 F.3d at 163 (requiring an ALJ to make affirmative findings regarding a claimant's subjective complaints).

First, despite the alleged disability onset date of July 20, 2002, plaintiff's work history report indicates that plaintiff worked a full-time job after that day. Specifically, from August 2002 to October 2002, plaintiff worked, full-time, as a teacher's aide. (Tr. 126). She left that line of employment not because of any health problems but because of budget cuts by the school. (*Id.*). Plaintiff maintained other part-time jobs after that, working sporadically at least until 2006. There is nothing in the record indicating plaintiff ever had to leave a job after the alleged onset date as a result of her neck and back problems. Plaintiff's clear ability to work, even if in pain, belies her assertion that she was unable to work as of July 2002.

Additionally, plaintiff's complaints are not consistent with the medical record. For example, plaintiff claims she became disabled on July 20, 2002, but there is nothing in the record indicating

any event occurred on or around that day that would have rendered plaintiff disabled.  Plaintiff

represented to the Commissioner that she used her cane because it was prescribed by the doctor after

her surgery to keep her body weight off of her motor nerve.  (Tr. 40-41, 142).  Two different doctors,

however, including the one plaintiff says prescribed use of the cane, indicated plaintiff did not

require the cane.  (*Id.* 283 (Dr. Cone indicating he was unsure of why plaintiff used the cane, as her

gait and posture were excellent); 333 (Dr. Kelley noting plaintiff carried a cane "but does not require

it").

     Moreover, as discussed above, plaintiff never saw a doctor for any form of treatment after

the alleged onset date.  The Fifth Circuit has held the fact that a plaintiff did not routinely seek

treatment for pain can be evidence discounting its disabling nature.  *See Villa v. Sullivan*, 895 F.2d

1019, 1024 (5th Cir. 1990).  A policy interpretation by the Commissioner likewise indicates,

> a longitudinal medical record demonstrating an individual's attempts to seek medical
> treatment for pain or other symptoms and to follow that treatment once it is
> prescribed lends support to an individual's allegations of intense and persistent pain
> or other symptoms . . . [T]he individual's statements may be less credible if the level
> or frequency of treatment is inconsistent with the level of complaints, or if the
> medical reports or records show that the individual is not following the treatment as
> prescribed and there are no good reasons for this failure.

SSR 96-7p, 1996 WL 374186 at *6 (July 2, 1996).

     The evidence in this case indicates plaintiff has not been to see any doctor for relief of any

problems since 1996.  In 1996, plaintiff was told she required back surgery, but she failed to pursue

that treatment option.  In 2005 and 2007, plaintiff met with doctors *in the pursuit of obtaining jobs*.

Those visits, however, were not initiated by her nor were they for the purpose of diagnosis and

treatment.  Rather, those doctor's visits were for the purposes of a potential employer discovering

whether plaintiff was physically capable of performing the tasks of the jobs for which she was a

candidate. Plaintiff's assertion that she suffered from disabling pain is undermined by the fact that she failed to obtain the recommended treatment in 1996 and failed to ever again seek medical attention after that date. Therefore, the ALJ's reliance upon the "lack of continuity in treatment regimen" in partially discrediting plaintiff's complaints was permissible. *See id.*, *Villa*, 895 F.2d at 1024. Finally, plaintiff herself stated she was able to lift twenty pounds, which is the same amount the ALJ determined she could occasionally lift. 20 C.F.R. § 404.1567(b); (Tr. 20, 141). The subjective evidence of plaintiff's disability and pain support the ALJ's determination.

### 4. Plaintiff's Age, Education, and Work History

At the time of the hearing, plaintiff was fifty-six years old. (Tr. 24, 47). She had a high school education. (*Id.* at 156). Her past relevant work history, as determined by the ALJ, was as a retail cashier and telemarketer. (*Id.* 22, 158). The ALJ asked the vocational expert who testified at the hearing about a hypothetical person, with plaintiff's past relevant work history, about the ability of a person with the capacity of "[l]ight work, reduced by the requirement that postural activity be on an occasional basis only, and . . . that reaching overhead be limited to occasion[al]." (Tr. 34). The vocational expert (VE) testified such a person would be able to work both as a cashier and a telemarketer. (*Id.*). All of the ALJ's findings, as set forth above, were supported by substantial evidence in the record. The VE's testimony, which appears to have been based upon a proper hypothetical, provides additional support for the ALJ's determination.

Weighing all of the considerations in a manner established by the Fifth Circuit, *See Wren*, 925 F.2d at 126, the Court concludes substantial evidence supported the ALJ's holding. The residual functional capacity determined by the ALJ was based, in part, upon Dr. Wright's findings. (Tr. 20, 373). Plaintiff complained of the ALJ's reliance upon this report, which she urges is

inaccurate, because Dr. Wright never personally examined plaintiff.  As far as the record before the Court indicates, however, plaintiff has taken absolutely no affirmative measures to obtain the opinion of a doctor who *had* examined her, even after the Commissioner twice offered to pay for such an examination and even though plaintiff had a doctor of her own who she could have presumably gone to for examination, but, for whatever reasons, did not.  There is no medical opinion to rebut the conclusions of Dr. Wright.

Plaintiff attempts to use Dr. Lucas's refusal to clear her for work as the equivalent of Dr. Wright's RFC determination.  First, even if the review and conclusions of Dr. Wright were comparable to those of Dr. Lucas, the ALJ is the one who must resolve any conflicts in the evidence. *See Laffoon*, 558 F.2d at 254.  The ALJ gave more weight to Dr. Wright's RFC than he did to Dr. Lucas's refusal to clear plaintiff for work, and this Court is not allowed to reverse that determination.  *See id.*  In any event, plaintiff fails to take into account that the ALJ's determination was also based in part on Dr. Lucas's evaluation.  Dr. Lucas noted Ms. Hall was able to move her neck with no limitation, bend her back forty degrees bilaterally without difficulty, and forward flex her back to eighty degrees without pain.  (Tr. 21, 361-62).  The ALJ's determination was also based upon the 2005 determination of Dr. Kelley.  Plaintiff overlooks the fact that Dr. Kelley was in the exact same position as Dr. Lucas in that he also examined plaintiff for purposes of verifying plaintiff was able to work.  Dr. Kelley concluded Ms. Hall could work without the imposition of any kinds of restrictions.  (*Id.* at 21).

There were no objective medical facts or opinions from treating or examining physicians indicating plaintiff was disabled from July 2002 forward.  Plaintiff's own subjective complaints were suspicious in light of her lack of consistency, failure to seek any medical attention at any point

after July 2002, and her ability to continue working after the alleged onset date.  Consequently, plaintiff's first ground of error is without merit.

### B.  Denial of Interim Benefits

In her second point of error, plaintiff contends the ALJ's denial of interim benefits resulted in a violation of her rights under the Equal Protection Clause.  The Equal Protection Clause works to protect the rights of certain protected groups of people from being infringed upon either by a law or through the application of a law.  U.S. Const., amend. XIV, § 1.  In order to even begin an Equal Protection analysis, however, a person must (i) have a right and (ii) have that right somehow violated.

In this case, plaintiff contends she had a right to interim benefits, which was violated.  This is simply not true.  The law establishes that, in certain situations, an individual may be entitled to receive benefits during a time when his or her permanent benefits are not certain or are not yet set up.  *See* 42 U.S.C. §§ 1383(a)(4), (7), (8).  Plaintiff does not fall into any of these categories.  In fact, as discussed above, plaintiff has not established she is entitled to long-term benefits, much less that she ever had the right to expect any interim benefits.  Because plaintiff never had a right to receive interim benefits, there is no basis for any kind of Equal Protection argument.  Plaintiff's second ground of error is without merit.

### C.  Timely Hearing

In her third and final ground of error, plaintiff avers the hearing by the ALJ was not timely.  Plaintiff initially contended the hearing was not timely because it was not held within ninety days of the denial upon reconsideration.  In her response to the Commissioner's answer, in which the Commissioner set forth that no such ninety-day deadline exists, plaintiff dropped the ninety-day

analysis but remained steadfast that the hearing was not timely conducted.

Plaintiff was denied disability benefits upon reconsideration on November 16, 2007.  (Tr. 49).  On December 15, 2007, plaintiff requested a hearing by an administrative law judge.  (*Id.* at 70).  On May 11, 2009, the defendant informed Ms. Hall her hearing had been scheduled for June 17, 2009.  (*Id.* at 72, 78).  The delay between plaintiff's request for the hearing and the hearing itself was approximately one year, six months.

The Commissioner is correct in that, contrary to plaintiff's assertion, the Commissioner is not limited to ninety days, starting at the point a claimant requests a hearing, to conduct an ALJ hearing.  Congress has never passed such a mandate, and the Supreme Court has expressly overturned a federal court's efforts to impose such a requirement. *See Heckler v. Day*, 467 U.S. 104, 110, 104 S.Ct. 2249, 2253, 81 L.Ed.2d 88 (1984).

Even if it is assumed, for purposes of argument, that the time between the request for the hearing and the hearing itself was unreasonably long, plaintiff would not receive any relief.  The relief which would be available to plaintiff if the Court concludes the dely was unreasonably long, would be injunctive relief requiring the ALJ hold an immediate hearing.  *See id.* at 2252, 104 S.Ct. 109.  As far as this case is concerned, however, the point in time for such action has long passed.

The payment of interim benefits for each day of unreasonable delay might also make sense as a general form of relief.  *See id.* at 2253, 104 S.Ct. at 110.  In this case, however, the Commissioner ultimately determined plaintiff was not entitled to disability.  If plaintiff is not ultimately entitled to disability, she certainly cannot be entitled to interim benefits while waiting for the Commissioner's adverse determination.  To hold such would be tantamount to imposing a fine

on the Commissioner for an unreasonable delay in conducting an ALJ hearing, and there is no basis in law for the imposition of such a fine in a case such as this one.  Consequently, even if plaintiff's allegation is accurate, there is no relief that this Court could offer her.  Even if plaintiff's third ground of error had merit, there is no relief this Court could give her.

IV.

RECOMMENDATION

It is the opinion and recommendation of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the defendant Commissioner finding plaintiff not disabled and not entitled to a period of benefits be AFFIRMED.

V.

INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 15th day of February, 2012.


_____

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE


\* **NOTICE OF RIGHT TO OBJECT** \*

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. Petitioner. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. Petitioner. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. Petitioner. 72(b)(2); *see also* Fed. R. Civ. Petitioner.

6(defendant).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."   Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.   A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.   *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).